UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

NO.

SHELLEY HOLCZER, individually and as Administrator of THE ESTATE OF LEHEL HOLCZER,

    Plaintiffs,

v.

LINCOLN NATIONAL CORPORATION and LINCOLN NATIONAL LIFE INSURANCE COMPANY, collectively d/b/a LINCOLN FINANCIAL GROUP

    Defendants.

**COMPLAINT**
**JURY TRIAL DEMANDED**

**NOW COMES** the Plaintiff, SHELLEY HOLCZER, individually and in her capacity as Administrator of the Estate of Lehel Holczer (hereinafter "Plaintiffs"), by and through her undersigned attorney, hereby files this Complaint for damages and other legal and equitable relief from Defendants LINCOLN NATIONAL CORPORATION (hereinafter "Lincoln National") and LINCOLN NATIONAL LIFE INSURANCE COMPANY (hereinafter "Lincoln Life), collectively doing business together as LINCOLN FINANCIAL GROUP (together "Defendants" or "Lincoln"), for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Declaratory Relief and, Violations of the North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1, et seq.

## NATURE OF THE ACTION

1. This is an action brought by Shelley Holczer individually and as Administrator of the Estate of Lehel Holczer as primary beneficiary of the JP Legend 300 life insurance policy (hereinafter "Legend Policy") issued to her husband Lehel Z. Holczer (hereinafter the "Decedent") by Jefferson-Pilot Corporation (hereinafter "Jefferson-Pilot"). Defendant Lincoln National is a successor-in-interest to Jefferson-Pilot. In that capacity and in conjunction with Lincoln Life, Defendants unlawfully increased the cost of insurance (hereinafter "COI"), caused the Legend Policy to lapse prematurely, and subsequently denied Plaintiff Shelley Holczer the Legend Policy's death benefit to which she was legally entitled.

2. In or around 2002, Jefferson-Pilot, Lincoln National's predecessor-in-interest, sold Decedent the Legend Policy, which is a flexible premium adjustable life insurance policy. This policy, known as a universal life insurance policy, combines aspects of term life insurance (i.e. a policy that pays a "death benefit" in the event of the insured's death during a specified term) with an investment component (i.e. an interest-bearing "cash value account" into which premium payments are made).

3. The Legend Policy, unlike other kinds of whole life insurance policies that require fixed monthly premium payments, is flexible in that there are no fixed or minimum premium payments specified in the policy. Upon information and belief, this allows policyholders to vary the amount of premium payments they wish to pay.

4. The "policy value" is equal to the sum of premiums paid into the cash value account less monthly deductions and any withdrawals, plus interest earnings. Any premiums paid in excess of monthly deductions are added to the cash value account where they earn interest, often called the credited rate.

5. According to the terms of the Legend Policy, monthly deductions are equal to the COI, assessed for mortality, administration, and other expenses associated with the administration of the policy. Monthly deductions are deducted from the policy value, "regardless of whether or not premiums are paid" to provide for the insurance protection. Upon information and belief, a policyholder may choose, for example, not to pay a premium, or to pay a smaller premium and use the policy value to pay the remaining monthly deductions.

6. Upon information and belief, policyholders need only pay the minimum amount of premiums necessary to cover the monthly deductions in order to keep the policy in-force. If a policyholder fails to pay a premium when due, and the policy value is insufficient to cover the monthly deductions, the policy will enter a grace period, and the policyholder will receive notification of the minimum amount due. If that amount is not paid within the grace period, the policy will "lapse," and Lincoln will have no further obligation under the policy.

7. The Legend Policy authorizes Lincoln to determine the COI rate on a monthly basis; however, Lincoln's discretion to determine the COI rate is constrained by the terms of the policy. The policy provides that Lincoln must calculate the COI rate "based on Lincoln's expectations of future mortality, interest, expenses, and lapses. The Legend Policy further states that "any change" in COI rates "will be on a uniform basis for Insureds of the same rating class." Lastly, the Legend Policy states that Lincoln "will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

8. Upon information and belief, in or around August and September of 2016, Lincoln informed Decedent that he would face a COI rate hike (hereinafter the "JP-Lincoln COI Rate Hike"). Moreover, upon information and belief, in November of 2016, Decedent's

COI increased by roughly 47.5 percent, which was far beyond what the enumerated policy factors permit. The increase was also not uniform among policyholders.

9. In the alternative, Decedent was not informed of the COI rate hike by Defendants.

10. Upon information and belief, Lincoln's FAQ sheet distributed to agents stated three reasons for the increase: (1) "[l]ower investment income as a result of continued low interest rates," (2) [u]pdated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations," and (3) [u]pdated expenses, including higher reinsurance rates." However, these factors do not justify the sharp, disparate, and unusually distributed increases imposed upon the Decedent.

11. As the COI rate is by far the most costly and important component of the monthly deduction, small changes in the COI rate can produce a dramatic increase in the dollar amount of the monthly deduction, particularly at older attained ages. Consequently, the higher the COI rate, the greater the amount of premiums necessary to both maintain a positive policy value balance and avoid a lapse of policy.

12. Lincoln only pays the death benefit to the designated beneficiary if the policy is still in-force (i.e. has not lapsed) when Lincoln receives proof of the policyholder's death. By unlawfully increasing the COI right, Lincoln charged higher monthly deductions to force a lapse in policy and therefore deny the Plaintiff Shelley Holczer the death benefit to which she was legally entitled.

13. The JP-Lincoln COI Rate Hike breached the contract underlying the Legend Policy in at least the following respects:

    1. Increases were based upon non-enumerated prohibited factors;
    2. Increases were designed to recoup past losses rather than respond to future expectations;
    3. Increases were not non-uniform across insureds of the same rate class; and
    4. Lincoln refused to provide an illustration on the policy upon request, which it was required to do even in the absence of the COI rate hike.

14. Additionally, Jefferson-Pilot and Lincoln, as its successor-in-interest, broke laws across multiple states (including North Carolina) governing misleading advertisement of unrealistic future COI rates, given that it imposed increases that were unjustified by changes in future expectations.

**PARTIES**

15. Plaintiff Shelley Holczer (hereinafter "Plaintiff Beneficiary") is a citizen and resident of Lincoln County, North Carolina. Plaintiff Beneficiary is the primary beneficiary of the Legend Policy giving rise to this complaint, which was purchased by Decedent from Defendant's predecessor in interest, Jefferson-Pilot. As primary beneficiary, and pursuant

to the terms of the Legend Policy, Plaintiff Beneficiary is legally entitled to the policy's proceeds (i.e. the death benefit).

16. Plaintiff Shelley Holczer was appointed as as Administrator of the Estate of Lehel Holczer by the Clerk of Superior Court in Johnston County, North Carolina and is now acting as Administrator of the Estate of Lehel Holczer in the institution of this action, pursuant to the North Carolina General Statutes. Plaintiff Shelley Holczer is the personal representative of the Estate of Lehel Holczer and is a resident of Lincoln County, North Carolina.

17. Plaintiff Beneficiary and the Estate of Lehel Holczer will be referred to collectively throughout this Complaint as "Plaintiffs."

18. Defendant Lincoln National Corporation, an Indiana Corporation, has its principal place of business at 150 North Radnor Chester Road, Radnor, PA 19087.

19. Defendant Lincoln National Life Insurance Company, an Indiana Corporation, is a wholly owned subsidiary of Lincoln National Corporation, and has its principal place of business at 1301 S Harrison Street, Fort Wayne, IN, 46802.

20. On or about July 28, 2002, Jefferson-Pilot entered into contract with Decedent for the Legend Policy both giving rise to this complaint and naming Plaintiff Beneficiary as primary beneficiary.

21. Upon information and belief, on or around April of 2007, Jefferson-Pilot merged into Lincoln National Life Insurance Company. In doing so, Lincoln National Life Insurance Company, and Lincoln National Corporation, as its parent company, assumed Jefferson-Pilot's contractual obligations, including the Legend Policy, in the merger.

22. Lincoln National Corporation and its affiliates, including Lincoln National Life Insurance Company, conduct business under the marketing name "Lincoln Financial Group."

## JURISDICTION & VENUE

23. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendants are domiciled in different states, and the amount in controversy exceeds $75,000.00.

24. This Court has specific personal jurisdiction over the Lincoln Defendants because both entities have purposefully availed themselves to the privilege of conducting business within the state of North Carolina by maintaining a life insurance contract with Decedent, entering into transactions and receiving substantial profits from Decedent, consistently sending policy-related information to Decedent while Plaintiffs and Decedent resided in their North Carolina home.

25. Pursuant to 28 U.S.C. §1391(b)(3), the Western District of North Carolina is the proper venue for Plaintiffs' claims because the Defendants are subject to the court's personal jurisdiction with respect to the action giving rise to this complaint.

## STATEMENT OF FACTS

### A. Policy at Issue

26. The policy at issue is the Legend Policy issued to Decedent policyholder by Jefferson-Pilot on July 28, 2002. This policy was an all flexible-premium, universal life insurance policy, and had no fixed or minimum premium payments specified. As a result, Decedent was able to adjust the amount and frequency of premium payments so long as the policy value was sufficient to cover monthly deductions in connection with the COI charge, as well as a small administrative fee.

27. According to the Legend Policy, Jefferson-Pilot, and Lincoln as its successor-in-interest, was obligated to pay proceeds to Plaintiff Beneficiary as specified by the policy option as long as Decedent died while the policy was in-force. Decedent chose "Option I," meaning that Lincoln was obligated to pay Plaintiff Beneficiary the "Specified Amount," or one hundred thirty-six thousand dollars and zero cents ($136,000.00), upon proof of Decedent's death.

28. Plaintiffs bank account was drafted the requisite insurance premium every month that was paid to Defendants since the policy was established in 2002 until his death.

29. According to Defendants, Policy went into discontinued status in November 2020. Defendants accepted auto draft payments (November 2020 through March 2021) from Plaintiffs but then remitted them back to Plaintiffs after being notified of Decedent's death in March 2021.

30. Defendants canceled the policy in November 2020 in contravention of the terms of the Policy, existing law and in other ways specifically pled herein.

31. Lincoln determined the COI charge on a monthly basis as the COI rate for the month, multiplied by the number of thousands of "net amount at risk" for the month. The "net amount at risk" for the month is computed as the "death benefit for the month before reduction for any indebtedness, discounted to the beginning of the month at the guaranteed rate," less "the policy value at the beginning of the month."

32. Small changes in the COI rate can produce a dramatic increase in the dollar amount of the monthly deduction charge by Lincoln, particularly at older attained ages. Consequently, the higher the COI rate, the greater amount of premiums required to maintain a positive policy value balance and avoid lapse of the Legend Policy. The COI rate was by far the most costly and important component of the monthly deduction charge.

33. Value built up in the Decedent policyholder's interest-bearing account generated interest at a minimum guaranteed rate (or, potentially a higher non-guaranteed rate). Absent other contributions, the interest generated was reduced by the amount of the COI charge and a charge for administrative expenses associated with the policy. If the COI and administrative charge exceeded the interest generated for the month (plus any amounts paid into the policy account), the policy value (and interest generating "principal") was reduced by the monthly deduction.

34. As Jefferson-Pilot explained in some of its marketing materials, "Universal Life Insurance is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage. . . . The premiums you pay (less expense charges) go into a policy account that earns Interest. Charges are deducted from the account. If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower. If it keeps dropping, eventually your coverage will end. To prevent that, you may need to start making premium payments, or increase your premium payments, or lower your death benefits. Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value."

35. The size of the COI charge was highly significant to Decedent Policyholder for at least two important reasons: (a) the COI charge was typically the highest expense that Decedent paid; and (b) the COI charge was deducted from the policy account (i.e., the savings or investment component) of the policy, so Decedent forfeited the COI charge entirely.

36. The Legend Policy limited Lincoln's ability to increase COI rates by stating the following contractual limitations (emphasis added):

> The monthly cost of insurance rates are determined by us. **Rates will be based on our expectation of future mortality, interest, expenses, and lapses.** Any change in the monthly cost of insurance rates used will be on a **uniform basis** for Insureds of the same rate class.

37. This provision restricted the circumstances under which Lincoln could raise the COI rate and did not permit Lincoln to increase COI rates, for example, to cover for improper dividends Lincoln Life paid to Lincoln National, or miscalculations concerning past mortality assumptions, or past interest rates, expenses or lapse rates. Likewise, Lincoln was not permitted, pursuant to the policy terms, to increase COI charges to earn future profits higher than the level projected at the time the Legend Policy was priced. Under the Legend Policy, the COI rate could only be raised based on expected future experience relating to the enumerated factors resulting from a deviation between actual and assumed experience using actuarially sound practices.

38. Nowhere did the language of the Legend Policy permit Lincoln to increase COI rates and consequently increase the monthly deduction in order to recoup past losses or to recover for prior profits lower than the profitability assumed at pricing, including those associated with its guaranteed or non-guaranteed interest rates. Nor did the Legend Policy disclose

any ability or intent to do so. As such, Lincoln should not have increased its COI rates and in turn, its monthly deduction to recoup past losses, to recover for prior profits lower than the profitability assumed at pricing. Furthermore, Lincoln should not have increased the COI rates when there was no reasonable expectation of a future adverse change in mortality, interest, expenses and/or lapses.

39. Alternatively, even if the Legend Policy did not expressly bar Lincoln from increasing COI rates to cover past losses or poor portfolio management, the language is at least ambiguous to the point that it should be construed against the drafter (here, the successor-in-interest to the drafter, Lincoln) and consistent with the reasonable expectation of Decedent policyholder.

40. The Legend Policy also states that "[u]pon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

41. The Legend Policy was a form policy, and as such, Decedent was not permitted to negotiate different terms. It was a contract of adhesion.

## B. Lincoln's COI Increase & Effect

42. Upon information and belief, in or around August of 2016, Lincoln announced it would be increasing interest rates on certain Jefferson-Pilot policies.

43. Upon information and belief, in or around September of 2016, Lincoln sent a notice to Decedent Policyholder, announcing the increase effective beginning in October of 2016. To justify the increase to policyholders, Lincoln simply pointed to "nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."

44. Upon information and belief, Lincoln told its brokers that the COI increases were the result of:
    1. "Lower investment income as a result of continued low interest rates";
    2. "Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations"; and
    3. "Updated expenses, including higher reinsurance rates."

45. In or around November of 2016, Decedent's COI charge jumped from the October 2016 charge of two hundred eighty-eight dollars and twenty-three cents ($288.23) to four hundred twenty-five dollars and twenty-seven cents ($425.15), which was an estimated 47.5 percent increase.

46. Decedent's COI charge remained at an elevated level and continued to rise to five hundred seven dollars and seventy-two cents ($507.72) in March of 2020. *This large and sustained increase worked to rapidly decrease Decedent's policy value*. Moreover, Defendants terminated the policy based on the Plaintiffs policy reserve value being depleted.

47. On or around November 27, 2020, Decedent's Legend Policy entered the grace period because the policy value was insufficient to cover monthly deductions.

48. On or around February 4, 2021, Decedent received a lapse notification, effectively terminating Defendants' obligations according to the Legend Policy.

## C. The COI Increase Was Unlawful

### 1. The COI Increase Was Not Based on Enumerated Factors

49. The Jefferson-Pilot contract governing the Legend Policy states that "[r]ates will be based on our expectation of future mortality, interest, expenses, and lapses."

50. Upon information and belief, Lincoln pointed to three factors that it purported to justify the increase: lower investment income as a result of continued low interest rates, "updated" mortality assumptions, and "updated" reinsurance costs – but those estimates are not sufficient to and do not justify the 47.5 percent increase COI imposed on Decedent.

51. First, Lincoln's expectations of future investment returns could not reasonably be materially lower than what Lincoln originally expected – and any change in investment returns would be far too small to justify a COI increase of this massive size, especially when combined with the dramatic improvements in mortality that have occurred since the policies were priced.

52. Lincoln's COI increase resulted in COI rates higher than those set forth in illustrations sent to Decedent, from at least 2010 to 2014. But under the terms of the policy, and under basic actuarial principles embodied in Actuarial Standards of Practice 24, Lincoln was required to illustrate future COI rates based on Lincoln's then-current assumptions as to mortality, interest, and any other experience factors that underlie the COI rates. Because Lincoln's investment returns have not materially changed for the worse since the times when those illustrations were sent in 2010-2016, Lincoln cannot now claim that any change in investment return justifies the increase. For example, Lincoln National's Q2 2016 reporting supplement shows a 5.22 percent earned rate on reserves, a mere tenth of a percent lower than the prior year. Indeed, for the nine months ending September 30, 2016, Lincoln National reported that fee income from COI charges was up 9 percent over the first three quarters of 2015, while the "Account Values" and the "In-Force Face Amount" of universal life policies increased by only 2% as compared with the first three quarters of 2015. Similarly, on Lincoln's financial statements, Lincoln indicated that its "investment income" has grown in recent years, reporting: $4.551 billion (2012), $4.561 billion (2013), $4.648 billion (2014), $4.611 billion (2015), $4.631 billion.

53. Further, upon information and belief, as discussed in more detail below, Lincoln admits that it is relying on its "past" and "continued" alleged lower investment returns to justify the increase, which is impermissible because an increase can only be justified by changed future expectations. Likewise, as discussed below, Lincoln's attempt to justify the increase based on "lower investment income as a result of continued low interest rates" is a naked

attempt to circumvent the guaranteed minimum interest rate that the policy promised to credit to Decedent.

54. Second, reinsurance costs cannot provide material support for the increase, and reinsurance costs are not an enumerated permissible factor for an increase. Reinsurance is a cost that the insurer voluntarily undertakes with an undisclosed third party; it is not a cost of directly administering the policy. Further, Lincoln National's recent earnings releases do not mention losses due to increased reinsurance costs at all – in fact, its Q4 2014 results show a $53 million profit on recapturing policies from out of reinsurance contracts. Whatever changes there have been in Lincoln's future reinsurance costs cannot provide material support for the increase.

55. To the extent Lincoln claims that the third-party reinsurance companies demanded premium increases, or that Lincoln recaptured certain liabilities associated with the policies to avoid increased reinsurance premiums, any such increases were a direct result of Lincoln's own past failure to adhere to the underwriting standards used to price the reinsurance treaties rather than any future change in expected experience.

56. Third, Lincoln claims that changing mortality expectations has contributed to COI increases. But the opposite is true: Lincoln filed interrogatories with the NAIC in each year from 2010 to 2014 stating that it expects mortality experience to improve. Additionally, upon information and belief, Lincoln's 2015 Annual Statement stated that "mortality experience is also predicted to improve in the future." And in its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, Lincoln National informed investors that "[m]ortality was in line with [Lincoln National's] expectations during the third quarter of 2016."

57. Nationwide, mortality (normally the most important element in COI rates) has continuously improved since the policies were issued. Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary (CSO) mortality tables. These are industry standard mortality tables that were commonly used by insurers at the time the policies were priced to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to continuous mortality improvements since 2001.

58. Moreover, upon information and belief, Lincoln sent the Decedent several illustrations on the Legend Policy using the pre-increase COI rates. The policy states that the illustrations will depict future COI rates based on "current mortality and interest factors." The illustrated COI rates in those illustrations were significantly lower than what they are after

9

the COI increase, but mortality experience has not changed for the worse in the years since those illustrations were provided. Since the illustrations were required to reflect "current mortality" when issued, and they illustrated cheaper future COI rates using those mortality assumptions, Lincoln cannot use its now-current mortality experience to justify a massive increase in COI rates. Alternatively, if the illustrations did not reflect Lincoln's then-current mortality assumptions when provided, then all these illustrations breached the contractual provision that the illustrations must be based on "current mortality and interest factors."

59. Finally, changing interest rates, mortality, and reinsurance costs could not possibly justify the large and unusually sloped increase imposed on the policy at issue. Specifically, no changes in these factors could warrant imposing an increase that would result in Plaintiffs paying higher COI rates when the insured is younger than when she is older, which is the case for the Martindale policies. This contradicts reasonable actuarial practice; for example, the Society of Actuaries report of the Individual Life Insurance Valuation Mortality Task Force lists three basic goals for the mortality table, and the COI rates for the Martindale Policies run contrary to the third: "Mortality for any given attained age should increase with duration since issue." Some other factor must have been included in the increase to generate that strange and illogical shape, and the contract language does not permit such other factors to be used as the basis for a COI increase.

### 2. The COI Increase Operated to Recoup Past Losses

60. The contract requires that "[r]ates will be based on our expectations of future mortality, interest, expenses, and lapses." This forbids COI increases that are based on a carrier's desire to increase profits beyond the level assumed at pricing or to make up for past losses. Actuarial principles similarly prohibit the carrier from implementing a COI increase that would result in the carrier making more profit on the policies than it originally expected using its original expectations. Further, in its fillings with the NAIC, Lincoln explained that "[c]ost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. The adjustments are made in such a way that past losses (i.e., experience less favorable to the company than expected) are not recouped."

61. Contrary to these basic principles, Lincoln admitted that it was using the increase to recover past losses when, in its letter to Decedent, it pointed to "nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets" to justify the increase. Lincoln doubled down on this admission when it told brokers that the increases were allegedly due to "lower investment income as a result of continued low interest rates." (Emphasis added.) Lincoln's President and CEO Dennis Glass admitted to a reporter in or around September 2016 – during the same time frame the increase was announced – that Lincoln sees in-force repricing (i.e., COI increases) as an opportunity to blunt the impact of the prevailing low interest rate environment.

62. Further, the facts stated above (including dramatic improvements in mortality), which indicate that a COI increase of this magnitude could not be supported by changes in Lincoln's future cost expectations, confirm that Lincoln is increasing its profit targets on

an old, closed block, and is attempting to recoup past losses. In addition, the illustrations sent to Decedent was required to be based on then-current mortality assumptions. Because mortality assumptions have not materially changed for the worse since then, the new increase massively increases Lincoln's profits on the policy.

63. In revealing that the increase is allegedly due in part to "lower investment income as a result of continued low interest rates" (emphasis added), Lincoln has made plain that it is trying to avoid its contractual obligation to meet the high interest crediting rates it promised under the Policy, and to recoup past losses or past profits lower than the level of profitability assumed at pricing – thereby increasing future profits to levels higher than those projected at pricing. The policies guarantee that Lincoln will credit to policy accounts a minimum interest rate, often called the credited rate, of no less than 4% interest. While the interest rate can be higher, it cannot be lower than that – and the interest rate Lincoln credits is now at the floor of 4%.

64. In April 2012, the Center for Insurance Policy & Research (CIPR), a branch of the National Association of Insurance Commissioners, published a report warning of the effects on insurers of a prolonged period of low level interest rates, stating in relevant part:

> Life insurance companies face considerable interest rate risk given their investments in fixed-income securities and their unique liabilities. For life insurance companies, their assets and liabilities are heavily exposed to interest rate movements. Interest rate risk can materialize in various ways, impacting life insurers' earnings, capital and reserves, liquidity and competitiveness. Moreover, the impact of a low interest rate environment depends on the level and type of guarantees offered. Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment . . . .
>
> Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies. During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered.
>
> \*\*\*
>
> In a low interest rate environment, it is challenging to find relatively low- risk, high-yield, long-duration assets to match annuities that guarantee a minimum annual return (e.g., 4%). For many policies, low interest rates mean that some mismatch with assets is likely. For example, older fixed income insurance products that guarantee rates of around 6%—closely matching or conceivably even surpassing current investment portfolio yields—are likely to put a strain on life insurers as a result of spread compression or possibly negative interest margins.

CIPR Report, at 2-3.

65. Lincoln explained that the increase was based on prior low investment returns, which caused Lincoln to sustain past losses or past profit levels lower than the priced-for levels during those prior years. Lincoln now seeks to offset or subsidize its credited interest guarantees and recoup its past financial problems through the COI rate increases and increased monthly deductions. What Lincoln is actually doing is attempting to avoid its obligation to credit the guaranteed interest rates under the Legend Policy, to recoup past losses or past reduced profits and to shed the policy by making the premiums to maintain them cost-prohibitive for the Decedent – thereby frustrating the Decedent and Plaintiffs abilities to receive their contractual benefits under the policy.

66. Moreover, when Jefferson-Pilot priced and sold the Legend Policy, it established a monthly deduction schedule that was designed to generate high profits in early durations followed by potential losses in later durations. Now, Lincoln, the successor to Jefferson-Pilot, wants to reverse that decision, and seeks to impose unfair and excessive COI rate increases to recoup the reduced profits and losses resulting from the rate schedule the company it acquired affirmatively enacted.

67. However, non-guaranteed elements such as the COI rate and monthly deduction are required to reflect expectations of future, not past, experience. Accordingly, Lincoln is precluded from re-determining those elements to recoup past losses or past constrained profits. To do so would violate the actuarial standards of practice and code of professional ethics.

68. The Decedent was hit excessively hard by Lincoln's unconscionable business practice because he was elderly when he died (Age 79 - Date of Birth 01/29/1942). The Decedent dutifully paid premiums for close to two decades based on the expectation that when he died, the Legend Policy would provide protection for his family. Due to the fact that the policy lapsed before Decedent passed, his wife, Plaintiff Beneficiary, can no longer receive the death benefit promised in his policy. Thus, Defendants' actions have completely stripped Plaintiff Beneficiary of protection to which she was legally entitled.

69. Lincoln's actions in depriving Plaintiffs of the benefit of the Legend Policy – paid for through years of contributions to Decedent's policy values – violates Lincoln's express and implied obligations under the policy, amounts to "unlawful" and "unfair" conduct, and elder abuse.

### 3. The COI Increase Was Not Uniform

70. The policies listed among the class representatives show widely varying increases, including within the same rate class.

71. In addition, an illustration provided by Lincoln Life of the COI increase on Martindale Policies (policies issued to other individuals wronged by Defendants' same conduct) shows increases of roughly 95% in the first year and 50% in the remaining two years. The increase also results in the COI rates being higher when the insured is 98 years old than when he or she is 99 years old. This is illogical and contrary to how the policy was originally priced, and was not replicated across the class of people similar to Plaintiffs. Other named

12

plaintiffs, and other victimized policyholders of the same rating class, did not receive an increase with this strange and illogical slope, which is contrary to basic actuarial principles that "mortality for any given attained age should increase with duration since issue."

72. These non-uniform increases violate the contractual provision stating that "Any change in the monthly cost of insurance rates used will be on a uniform basis for Insureds of the same rating class." (Emphasis added.)

### 4. Lincoln Refuses to Provide Illustrations of Policies in Their Grace Periods Upon Request.

73. The Legend Policy states: "Upon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors. The first illustration in any policy year will be furnished free of charge. Any illustration after the first in any policy year may be obtained for a fee of $10.00."

74. Upon information and belief, other individuals wronged in a similar manner by Lincoln requested an illustration for the Martindale policy in January 2017, but Lincoln refused to provide an illustration on the grounds that the policy is in its grace period, stating a company-wide policy: "While a policy is in a grace period, we are unable to provide an in force illustration."

75. By refusing to provide an illustration, Lincoln breached the contract. Lincoln's companywide refusal to provide illustrations to any policyholder whose policy is in its grace period is in contravention of the same contractual language. During the grace period, policy is considered to be in force.

76. Upon information and belief, Lincoln was not entitled to arbitrarily charge an increase in the COI.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

77. Plaintiffs incorporate herein by reference all allegations contained in the above paragraphs and throughout this entire Complaint as though the same were fully set forth herein at length.

78. The Legend Policy to which Plaintiff Beneficiary is beneficiary is a binding and enforceable contract. Lincoln is the successor-in-interest to Jefferson-Pilot, and as such, is a party to the Decedent's Legend Policy.

79. Plaintiff Beneficiary is a third-party beneficiary to whom Decedent intended to confer the benefit of contract performance. As intended beneficiary, Plaintiff Beneficiary has an independent right of enforcement of contract provisions.

80. The 2016 COI rate increase has materially violated the policy, and the implied covenant of good faith and fair dealing.

81. The Decedent performed all of his obligations under the policy, except to the extent that his obligations have been excused by Lincoln's conduct as set forth herein.

82. Decedent died on or around March 21, 2021. Decedent was suffering from cognitive decline in the months leading up to his death and Defendants refused to speak with Plaintiffs.

83. Lincoln breached its agreement with Plaintiffs by wilfully refusing to pay the death benefit to Plaintiffs. But for Defendants actions described herein, Policy would not have gone into discontinued status in November 2021 and would have been in full effect well after Decedent's death on March 21, 2021.

84. Lincoln has materially breached the Legend Policy, and in doing so, has directly and proximately caused damage to Plaintiffs as alleged herein and in an amount in excess of one hundred thirty-six thousand dollars and zero cents ($136,000.00) to be proven at a trial of this matter.

## SECOND CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

85. Plaintiffs incorporate herein by reference all allegations contained in the above paragraphs and throughout this entire Complaint as though the same were fully set forth herein at length.

86. Lincoln is the successor-in-interest to Jefferson-Pilot, and as such, is a party to the Decedent's Legend Policy. As intended beneficiary, Plaintiffs have an independent right of enforcement of contract provisions.

87. Contractual covenants of good faith and fair dealing through which Lincoln owes Plaintiffs a duty to act in a manner that did not frustrate her reasonable expectations under the Legend Policy are implied in the policy.

88. Lincoln contractually breached the covenant of good faith and fair dealing because, to the extent Lincoln had the discretion to increase the COI rate and monthly deductions, that discretion was sufficiently constrained under the terms of the policy to support an implied obligation of good faith and fair dealing with respect to COI charges and associated extraordinarily high premiums. Lincoln further breached the covenant of good faith and fair dealing by imposing unfair and burdensome premium increases that caused the Legend Policy to lapse such that Plaintiffs could not receive the death benefit.

89. Lincoln's contractual breach of the covenant of good faith and fair dealing has proximately caused damage to Plaintiffs as alleged herein and in an amount in excess of one hundred thirty-six thousand dollars and zero cents ($136,000.00) to be proven at trial of this matter.

## THIRD CLAIM FOR RELIEF
### (Declaratory Relief)

90. Plaintiffs incorporate herein by reference all allegations contained in the above paragraphs and throughout this entire Complaint as though the same were fully set forth herein at length.

91. An actual controversy has arisen and now exists between Plaintiffs and Lincoln concerning the respective rights and duties of the parties under the policy.

92. Lincoln contends that it lawfully and appropriately increased the COI amount, has appropriately collected COI charges based on the elevated monthly deductions. However, Plaintiffs maintain that Lincoln has inappropriately and unlawfully, in material breach of express and implied terms of the Legend Policy, implemented and collected the inflated COI amount.

93. Plaintiffs seek a declaration as to the parties' respective rights under the Legend Policy and request the Court to declare that the COI increase is unlawful and in material breach of the policy so that future controversies under the policy may be avoided.

## FOURTH CLAIM FOR RELIEF
### (Violations of the North Carolina Deceptive and Unfair Trade Practices Act)

94. Plaintiffs incorporate herein by reference all allegations contained in the above paragraphs and throughout this entire Complaint as though the same were fully set forth herein at length.

95. The North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1, makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

96. The sale and maintenance of life insurance policies through monthly transactions, like that of the Legend Policy, constitutes trade or commerce within the meaning of N.C. Gen. Stat. § 75-1.1.

97. Lincoln engaged in unfair and deceptive acts by surreptitiously raising the COI rate for the Legend Policy and representing that this rate increase was in fact justified when Lincoln knew that its rate increase was not justified by future mortality rates (or any other proper justification for rate increases).

98. Lincoln's conduct frustrated the performance of the contract, and deceptively misled Plaintiffs about the true reasons for the increase, in order to hide the breach. This conduct offended established public policy in North Carolina, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, and amounts to an inequitable assertion of Lincoln's power and position over these form contracts.

99. As a direct and proximate result of these unfair and deceptive commercial practices, Plaintiffs have suffered monetary damages in an amount in excess of one hundred thirty-six thousand dollars and zero cents ($136,000.00) to be determined at a trial of this matter.

WHEREFORE, Plaintiffs prays the court as follows:

1. Plaintiffs have and recover of Defendants, an amount in excess of $136,000.00 to be determined at a trial of this matter for Plaintiffs' past, current, and future compensatory damages;

2. Plaintiffs demands a trial by jury on all issues of fact so triable herein;

3. Attorney's fees and treble damages as allowed pursuant to N.C. Gen. Stat. § 75;

4. Attorney's fees as allowed by law;

5. Such other and further relief as the court deems just and proper.

This the 17th day of September, 2023.

*/s/ M. Anthony Burts II*
M. Anthony Burts II
Attorney for Plaintiff
P.O. Box 102
Newton, NC 28658
T: (704) 751-0455
F: (704) 413-3882
anthony@burtslaw.com
N.C. Bar No. 49878